IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ELIZABETH O'SHAUGHNESSY, ) <br> MICHAEL O'SHAUGHNESSY, and ) <br> RANDALL L. HENSLEY, Individually ) <br> and on Behalf of Others Similarly Situated, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> v. ) <br>   ) <br> CYPRESS MEDIA, L.L.C., ) <br>   ) <br> Defendant. ) | No. 4:13-cv-0947-DGK |

## ORDER DENYING CLASS CERTIFICATION

This putative class-action lawsuit alleges that Defendant Cypress Media, L.L.C. ("Cypress"), a newspaper publisher, unlawfully "double-billed" some of its subscribers. This lawsuit was originally filed in the Circuit Court of Jackson County, Missouri, and then removed to this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332.

Now before the Court is Plaintiffs' Motion for Class Certification (Doc. 67). Finding that Plaintiffs have not demonstrated that there are questions of law or fact common to the class, or that questions of law or fact common to the class predominate over questions affecting individual members, the Court DENIES the motion.

**Factual Background**

Defendant Cypress owns and operates three newspapers, the *Kansas City Star* ("the *KC Star*"), the *Fort Worth Star-Telegram* ("the *Star-Telegram*"), and the *Belleville News-Democrat* ("the *News-Democrat*"). The named Plaintiffs in this case are Elizabeth O'Shaughnessy, Michael O'Shaughnessy, and Randall Hensley.

Elizabeth and Michael O'Shaughnessy share one account with the *KC Star* and have been subscribers for approximately 25 years. They have spent about eight hours participating in this case, and they have not reviewed any filings since the initial petition.

Randall Hensley is the brother of Plaintiffs' counsel Jeff Hensley. He subscribed to the *KC Star* from October 12, 2009, to November 7, 2013. Randall Hensley has spent about three hours participating in this litigation, and, aside from reviewing the initial petition, he has not reviewed the motions or other filings in this case.[1]

None of the three have ever subscribed to, or purchased anything from, the *Star-Telegram* or the *News-Democrat*.

Plaintiffs' Petition alleges Cypress unlawfully double billed some of its subscribers by shortening the length of their subscriptions. It seeks compensatory damages for breach of contract (Count I), breach of implied duty of good faith and fair dealing (Count II), violation of the Missouri Merchandising Practices Act ("MMPA") (Count III),[2] and a claim for money had and received (Count IV).

From August 1, 2008, to August 1, 2013 there were approximately 363,561 home delivery subscribers to the *KC Star*. Of these, 201,122 were Missouri residents, 161,814 were Kansas residents, and 625 were residents of other states. During this same period, there were 314,358 home delivery subscribers to the *Star-Telegram* and 85,394 home delivery subscribers to the *News-Democrat*. All of the former were Texas residents, and all of the latter were Illinois

---

[1] Defendant contends Hensley received "discounted rates during much of the class period" and "received numerous credits on his account to induce him to remain a subscriber." The billing records it has submitted in support fall short of proving these claims.

[2] Although the MMPA is the only consumer protection statute mentioned in the Petition, Plaintiffs' briefing suggests Cypress's billing practice violates other states' consumer protection statutes as well. For example, Plaintiffs contend that the common questions of law and fact in this case include whether the Billing Practice violates the MMPA "and similar consumer protection statutes." Suggestions in Supp. (Doc. 67) at 14.

residents. The total number of home delivery subscribers to these three newspapers during this time period was 763,313.

Home delivery newspaper subscriptions at each newspaper operate as follows. A subscriber initiates service through one of several methods, usually at one of many discounted introductory rates, and pays for an initial billing period or agrees to a monthly charge by a debit or credit card. (The monthly debit option is called "Easy Pay" by the *KC Star* and "EZ Pay" by the *News-Democrat* and the *Star-Telegram*). Subscription service is ongoing and ends only when a subscriber cancels. After the introductory period expires, the subscription converts to a full-rate subscription for that frequency (number of days per week the subscriber receives a newspaper), and the subscriber is asked to select and pay for a new billing period. Subscription rates vary by newspaper.

Each paper uses multiple different forms, both written and oral, to explain to initial subscribers what the terms of the subscription are. When a subscriber's billing period is about to end, the subscriber receives a written subscription renewal notice that sets out the options for the next billing period. Each paper's renewal notice is slightly different. Some of these differences are merely differences in wording or format; others are substantive. Generally speaking, the renewal notice might include some language informing the subscriber of various terms affecting their subscription service, including charges for special editions of the paper, the ongoing nature of their subscription service, and other information. Again, the exact contents of the renewal notice varies by newspaper.

While the billing period on initial subscription documents and the Subscription Renewal Notices is for terms of weeks, months, a year, the subscription service itself is ongoing. As each newspaper is delivered, the subscriber is charged a debit to the amount deposited to the

subscriber's account. For some subscribers, Cypress deducts charges for premium editions—occasional editions of the newspaper that include special content above and beyond that included in a typical newspaper edition,[3]—by shortening the subscriber's billing period. For example, if the subscriber's billing period were set to expire June 30, and then the subscriber receives a special edition, Cypress would shorten the billing period to June 27 (or whatever number of days that at the regular rate equaled the charge for the premium edition), to account for the premium edition. The customer-specific portion of the subscription renewal notice may or may not disclose the debits for premium editions.

The date on which the funds in the subscriber's account are expected to expire is referred to as the "paid-through" date or the "pays to" date. When funds in the account near the paid-through date, a subscription renewal notice is sent prompting the subscriber to pay for the next subscription billing period.

As administered by Cypress, billing periods are estimates and flexible based on changes in delivery frequency, customer choice, and credits and debits that may accrue during the billing period. Credits may be given for missed papers, late delivery, poor delivery service, or to induce a customer to remain a subscriber. When a credit is added to a subscriber's account, the effect is to extend the number of days remaining in a billing period, which extends the paid-through date. Debits to an account, such as premium editions, shorten the paid-through date. It is unclear from the record whether any other events besides premium edition charges shorten the paid-through date.

Policies regarding receipt of, and charges for, premium editions vary by newspaper. Subscribers to the *KC Star* can opt out of receiving premium edition charges by calling customer

---

[3] Premium editions often focus on a holiday, a prominent local event, or an election. The content for a premium edition varies for each paper. Premium editions are charged at a higher daily rate because they include additional content and cost more to produce and deliver.

4

service. Those who opt out receive the premium edition at the regular daily rate. Different subscribers were charged different amounts for premium editions based on variations in their normal daily rate. The *KC Star* changed its subscription renewal notice in March 2011.

Subscribers to the *News-Democrat* who select the EZ Pay option, which allows for automatic, recurring credit card billing, are not charged for premium editions. Until September 30, 2013, the *Star-Telegram* was on a carrier collect system where carriers were charged for premium editions and then were responsible for charging the subscriber whatever amount the carrier determined. Additionally, Cypress did not charge some subscribers on introductory promotional rates for premium editions.

With few exceptions, Premium Editions are only delivered to subscribers who already receive the paper that day as part of their normal delivery frequency. For example, if a premium edition is delivered on Thursday but the subscriber is on a Sunday-only delivery frequency, the subscriber does not receive the Premium Edition and is not charged for it.

## Standard Governing Class Certification

Rule 23 governs class certification. A party seeking class certification must satisfy all of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Fed. R. Civ. P. 23(b). The Supreme Court has instructed district courts to engage in a "rigorous analysis" in determining whether the Rule 23(a) requirements are met. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982). These requirements are satisfied when "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of

5

the class." Fed. R. Civ. P. 23(a). They are typically summarized as numerosity, commonality, typicality, and adequacy. *In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 780 (3d Cir. 2009).

Plaintiffs identify Rule 23(b)(3) as the Rule 23(b) category they are pursuing. Under Rule 23(b)(3), a party seeking class certification must satisfy the court that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A finding under subsection (3) may be based on,

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). In addition to these explicit requirements, Rule 23 implicitly requires that a class exist, that the proposed representative be a member of the class, and that the proposed class be "ascertainable or identifiable" and "administratively manageable." *Dumas v. Albers Med., Inc.,* No. 03-0640-CV-W-GAF, 2005 WL 2172030, at *5 n.7 (W.D. Mo. Sept. 7, 2005).

The party seeking class certification bears the burden of showing that all of the requirements have been met. *Perez-Benites v. Candy Brand, LLC*, 267 F.R.D. 242, 246 (W.D. Ark. 2010). This includes the burden of defining a proper class. *See In re Paxil Litig.,* 212 F.R.D. 539, 546 (C.D. Cal. 2003).

## Discussion

Plaintiffs propose defining the class as,

6

> All present and former home delivery subscription customers of Cypress Media, LLC who entered into Standard Agreements with Cypress Media, LLC, through the Cypress Companies, for Newspaper Services during the time frame from July 26, 2008, through the present, where Cypress Media, LLC shortened the Home Delivery Subscription Customer's paid for Subscription Period as a result of Cypress Media, LLC's Billing Practice.

Suggestions in Supp. (Doc. 67) at 11. Plaintiffs define the "Billing Practice" as Cypress's shortening customers' agreed upon and paid for subscription periods to pay down charges incurred by receiving "Premium Editions," "Special Editions," "Frequency Days," and "Bonus Days." *Id.* at 7. They define "home delivery subscription customers" as "those newspaper subscription customers of the Cypress Companies who receive printed newspapers delivered to their residence or a business."[4] *Id.* at 3. Plaintiffs define "Standard Agreements" as "typewritten, standard-form subscription agreements and subscription renewal agreements, or other materially similar written agreements with Cypress through the Cypress Companies for Newspaper Services." *Id.* at 2. Plaintiffs have submitted several different form agreements from each newspaper as purported examples of these "Standard Agreements."

## I.  The Rule 23(a) factors are not satisfied.

Of the four Rule 23(a) factors, no factor besides numerosity is completely satisfied here. Although the typicality and adequacy factors are partially met and could satisfy a class that was more narrowly defined, the lack of commonality in the claims of any conceivable class here is fatal to Plaintiffs' motion. The Court discusses each of these factors below.

### A.  The numerosity requirement is satisfied.

There is no magic number to satisfy the numerosity requirement; the putative class must simply be so numerous that joinder of all class members is impractical. *In re St. Jude Med., Inc.,*

---

[4] The phrase "home delivery subscription customers" is a misnomer because it includes customers who receive printed newspapers at their place of business. While puzzling, this is irrelevant for certification purposes.

7

425 F.3d 1116, 1119 (8th Cir. 2005). Plaintiffs allege that hundreds of thousands of individuals and entities throughout Missouri, Kansas, Texas, Illinois, and elsewhere were subject to the Billing Practice. Cypress does not dispute numerosity, and it is clear that the number of potential class members is so large that joinder is impractical. Accordingly, the Court finds this element is satisfied.

> **B.** **The typicality requirement is not satisfied with respect to subscribers to the *Star-Telegram* or *News-Democrat*.**

"A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if his or her claims are based on the same legal theory." *Newberg on Class Actions* § 3:29 (5th ed. 2015). "The test for typicality is not demanding and 'focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'" *Id.* (quoting *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001)). The court should deny certification when the variation between the plaintiff's claims and the absent class members' claims "strikes at the heart of the respective causes of actions." *Id.* (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (8th Cir. 2006)). The plaintiff's claims need not be identical to those of the class; typicality is satisfied so long as named plaintiff's claims share the essential characteristics of the absent class members' claims. *Id.*

In the present case, Plaintiffs' claims are not typical of putative class members who subscribe to the *Star-Telegram* or the *News-Democrat*. Plaintiffs' claims arise out of their subscription to the *KC Star*, and as discussed below, the subscription agreements and renewal forms used by each newspaper are materially different. Even among the *KC Star* subscribers, Plaintiffs' legal theory may not be typical. Plaintiffs reside in Missouri, so the MMPA likely applies to their claims. Almost 45% of subscribers, however, live in other states, so their claims

8

may be governed by those states' law. And the Court cannot simply conclude that the MMPA is a "close enough" legal theory to the consumer protection laws of other states, when Plaintiffs do not reference any other state's law in the Petition. The *Star-Telegram* and *News-Democrat*'s subscriber's claims will be governed by Texas or Illinois law. *See Perras v. H&R Block*, --- F.3d ---, 2015 WL 3775418, at *4 (8th Cir. June 18, 2015) (noting that however broad the MMPA's scope, it does not regulate out-of-state transactions involving out-of-state class members; other states consumer protection statutes govern these claims). Hence, the named Plaintiffs' claims are typical only of, at best, *KC Star* subscribers.

### C. Randall Hensley is not an adequate class representative and the O'Shaughnessys' may represent *KC Star* subscribers only.

The purpose of ensuring that the named plaintiff will adequately represent the class is "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997). In order to satisfy 23(a)(4)'s adequacy requirement, the named plaintiff must be "part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625-26 (quotations omitted). In addition to determining the adequacy of the plaintiff as a class representative, the court must determine whether plaintiff's counsel is adequate. *Id*. In the absence of evidence to the contrary, the court assumes that class counsel is adequate. *Morgan v. United Parcel Serv. of Am., Inc.,* 169 F.R.D. 349, 357 (E.D. Mo. 1996). In the present case, Defendant disputes Plaintiffs' adequacy as class representatives, but not class counsel's adequacy to represent the class.

That said, Randall Hensley is not an adequate class representative for another reason— because he is the brother of one of the attorneys representing the putative class. A close personal relationship between the name plaintiff and class counsel "creates a *present* conflict of interest— an incentive for [the named plaintiff] to place the interest of [class counsel] above those of the

9

class." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003). This close relationship, in turn, "casts doubt on the [named plaintiff's] ability to place the interests of the class above that of class counsel." *Id.* A sibling relationship is especially problematic because there is a "natural assumption that brothers enjoy a close personal and family relationship" and so "would be inclined to support each other's interests." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 95 (7th Cir. 1977) (holding class counsel's brother was an inadequate class representative). Since Randall Hensley is related to class counsel, he is more likely to refrain from criticizing a fee request submitted by him, or to give too much deference to his recommendation regarding a settlement. *See London*, 340 F.3d at 1255; *Susman*, 561 F.2d at 95. Consequently, he is not an adequate class representative.[5]

Turning to the O'Shaughnessys, the Court finds they are adequate representatives of *KC Star* subscribers, but not *Star-Telegram* or *News-Democrat* subscribers. The O'Shaughnessys' claims are based on the *KC Star* subscription agreements and renewal forms they used, and their claims would be governed by Missouri law. These claims are different from the *Star-Telegram* and *News-Democrat* subscribers' claims, and perhaps even some Kansas-based *KC Star* subscribers' claims. Thus, the O'Shaughnessys' are adequate representatives of at most *KC Star* subscribers only.

This is important because there are conceivably three distinct classes (or subclasses) here: *KC Star* subscribers, *Star-Telegram* subscribers, and *News-Democrat* subscribers. If the class representatives are from only one group of subscribers a potential conflict of interest exists. There is a risk that in any settlement the class representatives might try to leverage the claims of

---

[5] Because the Court finds Randall Hensley is not an adequate representative for this reason, it does not need to address Cypress's other claim that he would not be an adequate representative because he has allegedly suffered no damages.

the class members in the other subclasses for their benefit. That is, they might discount the claims of the *Star-Telegram* and *News-Democrat* subscribers in return for Cypress paying a premium for *KC Star* subscribers' claims.

Because of this conflict, the Court will allow the O'Shaughnessys to serve as class representatives of *KC Star* subscribers only. Given that there are no other named Plaintiffs who subscribe to the *Star-Telegram* and *News-Democrat*, any class the Court might certify should be limited to *KC Star* subscribers.[6]

### D. The commonality requirement is not satisfied.

To satisfy Rule 23(a)(2)'s commonality requirement the plaintiff must do more than show the presence of common questions of law or fact. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). The plaintiff must show that there are common questions with "common *answers* apt to drive the resolution of the litigation" for the proposed class as a whole. *Id.* (quotation omitted). The class claims "must depend on a common contention" which is "of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve the issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiff contends that the common questions of law and fact in this case include whether the Billing Practice: is allowed under the Standard Agreements; breaches the implied duty of good faith and fair dealing; violates the MMPA "and similar consumer protection statutes;" and gave Cypress money it was not entitled to receive. Plaintiffs contend these "questions of law and

---

[6] Plaintiffs alternately argue that if the Court finds they are not adequate class representatives, the Court should allow the addition or substitution of unnamed class members as named plaintiffs. Unfortunately, Plaintiffs have failed to identify anyone who could serve in this capacity. The Court declines to certify a class and then see if Plaintiffs' counsel can find an adequate class representative. Because the Court holds that no named Plaintiff holds claims typical of the proposed class, it need not consider Defendant's argument that Plaintiffs have not spent sufficient time working on their case.

11

fact are *identical* to the entire proposed class." Suggestions in Supp. (Doc. 67) at 14 (emphasis added).

Cypress responds that there can be no common questions here because there are no Standard Agreements. Each newspaper used different language in various forms to communicate the terms of its subscription services to its readers. Even within each paper, different subscribers saw different language at different times describing these terms. There are material differences among subscribers that make any determination of liability issues through common evidence impossible. Cypress also contends there is no class-wide common injury.

After carefully reviewing the purported Standard Agreements, the Court finds that there are no Standard Agreements here which serve as common evidence on which to base class-wide liability determinations. Even within the same newspaper's stable of form agreements, the information provided about the newspaper's billing practices is so different that the forms are not "standard" in any way. For example, one alleged Standard Agreement submitted by Plaintiffs, a subscription order agreement used by the *KC Star* (Doc. 67-6 at 1), does not mention premium editions, higher rates, or paid-through dates at all. But other "Standard Agreements" used by the *KC Star*, various subscription renewal notices offered by Plaintiffs (Doc. 67-6 at 3, 5, 10), provide fairly detailed explanations of how much a subscriber will be charged for premium editions and when they will be published. Among other things, these forms state that

> For 2013, all subscribers will receive a paper in addition to their paid subscription on the following days, if service is available: Jan 21; Sept. 2; Sept. 16; Oct. 14; Nov. 11; Nov. 28; Dec. 23; and Dec. 24. Premium editions will be charged at a higher rate, not to exceed an additional $2.00, plus applicable tax. Premium Editions scheduled for 2013 include: January—Your 2013 Personal Finance Guide; March—Kansas City Food: A Collective Experience; May—Summer Planner; August—Football Preview;

12

September—Consumer Technology; and November—Thanksgiving Holiday Package.

(Doc. 67-6 at 3, 5, 10). These disclosures—or in the case of the subscription order agreement above, the lack of such disclosure—goes to the heart of Plaintiffs' case, because the Billing Practice may have been entirely legal if it was properly disclosed to the putative class members. The fact that two of the purported Standard Agreements from the same newspaper disclose materially different information concerning the alleged Billing Practice means they are not alike or "standard" for purposes of this case. Further, Plaintiffs have not suggested which potential class members may have received which Standard Agreements. Hence there is no way to establish liability on a class-wide basis, even among a subclass of subscribers to the *KC Star*.

Likewise, the "Standard Agreements" from the *News-Democrat* and *Star-Telegram* confirm that all three newspapers use multiple forms that are materially different from each other. The agreements used by the *News-Democrat* and *Star-Telegram* make different disclosures than those from the *KC Star*. One renewal notice sent by the *News-Democrat* (Doc. 67-7 at 1) notifies the reader that, "Your paid-thru date is subject to change due to charges for premium editions throughout the year." Another renewal notice sent by the *Star-Telegram* (Doc. 67-8 at 1) states, "On July 4th all home delivery subscribers will receive a Premium Content Section with an additional charge of $1.00. Current expire date will be adjusted." While similar, these renewal notices make different disclosures that are relevant to this lawsuit. The former indicates there may be charges for premium editions throughout the year. The latter states there will be one premium content publication sent; it will be sent on July 4; it will cost $1.00; and this charge will be paid for by adjusting the subscriber's subscription expiration date.

Depending on how each newspaper actually billed their respective customers and what services they actually provided, Cypress may have breached its contract or violated a consumer

13

protection statute with respect to different groups of customers. In order to make these determinations, however, the fact-finder will have to make individualized determinations about each form. Furthermore, given that the wording of these forms changed over time, and that customers used different forms to initiate and renew their subscriptions at different times, the fact-finder will have to sift through different documents for each subscriber to determine liability. As Cypress notes, a particular *KC Star* subscriber may have initially subscribed in response to a telemarketing call offering a special discounted rate, then continued her subscription under terms offered in a pre-March 2011 subscription renewal agreement, and then renewed her subscription again using a different renewal agreement. Thus there would be one set of facts relevant to her initial billing period; another set relevant to billing before March 2011, and a third set relevant to billing after March 2011. These facts would be different for *KC Star* subscribers who subscribed at different times or used different forms, and these facts would be different for *News-Democrat* and *Star-Telegram* subscribers as well. Moreover, Plaintiffs have not proposed any manageable way for the Court to potentially cleave off subclasses based on the receipt of certain forms at certain times. *See In re Paxil Litig.,* 212 F.R.D. at 546 (imposing on the plaintiffs the burden of defining the class). Hence, Plaintiffs fail to meet Rule 23(a)'s commonality requirement, and a class cannot be certified.[7]

## II. This case cannot be certified under Rule 23(b)(3) because common issues do not predominate over individual issues.

The proposed class here also fails because it does not meet Rule 23(b)(3)'s requirement that common issues predominate over individual ones, the 23(b) factor Plaintiffs have identified as justifying class certification. "At the core of Rule 23(b)(3)'s predominance requirement is the

---

[7] Because the Court holds that the lack of any Standard Agreement means the commonality requirement is not satisfied, it need not consider Defendant's claim that there is no class-wide common injury.

14

issue of whether the defendant's liability to all plaintiffs may be established with common evidence." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010). "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* "In making its determination, the district court must undertake a rigorous analysis that includes examination of what the parties would be required to prove at trial." *Avritt*, 615 F.3d at 1029. This analysis "is more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).

In the present case, it is impossible to determine on a class-wide basis whether Cypress incurred any liability to the class members because there were so many different service arrangements used by different class members at different times. Evidentiary variables include: the paper the class member subscribed to, when and how the class member subscribed, the exact language used in the initial agreement, whether and how the subscription was renewed, and the exact language used to renew the agreement. Even if Plaintiff proposed certifying a class of only Missouri residents who subscribed to the *KC Star*, issues of law or fact common to the class would still not predominate over individual issues. Although the fact-finder would not have to inquire about which paper the class member subscribed to, the evidence used to answer the remaining questions would still be different for each class member.

The obstacle to class certification here is that this is not a case where a single form contract was used throughout the class. Cypress used multiple forms which are not materially similar, a fact which makes it difficult for common issues of fact to predominate. *See Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th

15

Cir. 2010) ("[C]laims for breach of contract are peculiarly driven by the terms of the parties' agreement, and common questions rarely will predominate if the relevant terms vary in substance among the contracts. It is the form contract, executed under like conditions by all class members, that best facilitates class treatment.").

Of course, certifying a larger class would be even more difficult because the Court would have to perform a choice of law analysis for four states, and then likely apply the class member's home state law to his or her claim. This weighs against finding that common issues predominate. *See* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1780.1 (3d ed. 2014) ("As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class claims must be decided on the basis of the laws of multiple states" because "the legal issues no longer pose a common question"). This is particularly true where, as here, the class action would have to be litigated under the consumer-protection statutes of multiple states. *See, e.g.*, *Perras*, 2015 WL 3775418, at *4 (finding common questions of law did not predominate over any individual questions in class action which would have to be brought under multiple states consumer-protection statutes); *In re St. Jude Med.*, 425 F.3d at 1120 (noting an individualized choice-of-law analysis must be made for each plaintiff's claim, consumer protection laws vary considerably, and courts must respect these differences).

Accordingly, Plaintiffs have not shown that Rule 23(b)(3) is satisfied, and so the Court cannot certify a class.[8]

---

[8] Because this argument is dispositive of the Rule 23(b) issue here, the Court does not consider Defendant's other argument that individual issues predominate because damages are not capable of measurement on a class-wide basis.

16

## Conclusion

For the reasons discussed above, the Court holds Plaintiffs have not demonstrated that there are questions of law or fact common to the class, or that questions of law or fact common to the class predominate over questions affecting individual members. Accordingly, the Court DENIES Plaintiffs' Motion for Class Certification (Doc. 67).

**IT IS SO ORDERED.**

Date:  July 13, 2015 	         /s/ Greg Kays
	GREG KAYS, CHIEF JUDGE
	UNITED STATES DISTRICT COURT