IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ELIZABETH O'SHAUGHNESSY, MICHAEL O'SHAUGHNESSY, and RANDALL L. HENSLEY, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 4:13-cv-0947-DGK ) |
| CYPRESS MEDIA, L.L.C., | ) ) |
| Defendant. | ) ) |

## ORDER GRANTING SUMARY JUDGMENT

This lawsuit arises from Plaintiffs' allegations that Defendant Cypress Media, L.L.C. ("Cypress") unlawfully "double-billed" them for newspaper subscriptions. Now before the Court is Cypress's Motion for Summary Judgment (Doc. 130). For the following reasons, the motion is GRANTED.

**Summary Judgment Standard**

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of explaining the basis for its motion, and it must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). If the movant does so, then the nonmovant must submit evidence demonstrating that there is a genuine issue for trial. *Id.* The court views any factual disputes in the light most favorable to the nonmoving party. *Id.* Decisions concerning credibility determinations, how to

weigh the evidence, and what inferences to draw from the evidence, are decisions reserved for the jury, not the judge. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

When the burden shifts to the nonmoving party, it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor can the nonmoving party "create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S 557, 585 (2009).

## Undisputed Material Facts

The Court has limited the facts presented here to those that are not in dispute and relevant to this motion. The Court has also excluded legal conclusions, argument presented as fact, and proposed facts that are not properly supported by admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has included reasonable inferences from material facts not in dispute, and proposed facts the opposing party has not controverted properly.

Plaintiffs have failed to controvert properly most of Cypress's proposed facts. For example, Cypress's second proposed fact describes *The Star*'s procedures for crediting a customer's account, and it cites an affidavit from *The Star*'s Chief Financial Officer for support. Plaintiff attempts to controvert this fact by citing affidavits from two Plaintiffs, neither of whom ever worked at *The Star* or have any personal knowledge of how *The Star*'s accounting procedures. Hence, these affidavits violate the Federal Rules' requirement that affidavits opposing a fact must be based on personal knowledge. Fed. R. Civ. P. 56(c)(4). As a result, this fact is undisputed for summary judgment purposes. Fed. R. Civ. P. 56(e)(2).

Plaintiffs also argue many of Cypress's proposed facts should be stricken because they are supported by documents produced after the close of discovery. *See, e.g.*, Pls.' Resp. to SUF 21. Plaintiffs raised this argument in a separate motion to strike (Doc. 138) which the Court considered and denied. *See* Order Granting in Part Mot. for Sanctions (Doc. 157) (finding Cypress late-disclosed many documents during discovery, denying Plaintiffs' request to strike facts based on these documents, and instead ordering monetary sanctions).

Finally, Plaintiffs cannot controvert Cypress's proposed facts established via documents by stating, "The documents speak for themselves." *See Kings Pro'l Basketball Club, Inc. v. Green*, 597 F. Supp. 366, 369 (W.D. Mo. 1984) (holding such statements do not set forth specific facts showing there is a genuine issue for trial). The Court treats these improperly controverted facts as undisputed. Fed. R. Civ. P. 56(e)(2).

With that in mind, the Court finds the relevant, undisputed material facts to be as follows.

**A.** *The Star*'s **home delivery subscription billing and renewal procedures.**

Defendant Cypress owns a newspaper called *The Kansas City Star* ("*The Star*"). A home delivery subscription to *The Star* begins with a subscriber making an initial payment. As with most publications, subscribers to *The Star* pay in advance as opposed to paying in arrears.

After a subscriber makes the initial payment, *The Star* sets up an internal account in the subscriber's name. This internal account tracks the amount of the payment and establishes an estimated "pays to" or "paid-through" date for the subscription based on the amount of the payment and the newspapers the subscriber is expected to receive through that paid-through date. Twenty to thirty days before a subscriber's paid-through date is reached, *The Star* sends the subscriber a subscription renewal invoice ("Subscription Invoice") that offers various payment options for differing amounts and pay periods to extend the subscription.

3

When the subscriber makes a payment, *The Star* extends the estimated paid-through date. If a subscriber does not pay to continue his or her subscription before the paid-through date arrives, *The Star* continues to deliver newspapers for up to 89 days during a "grace period" before terminating the subscription. If the subscriber pays during the grace period, the payment is applied first to the newspapers that were delivered during the period and then to extend the paid-through date forward continuing the subscription. A subscription continues until the subscriber either instructs *The Star* to terminate it, or the subscriber fails to make a payment and the grace period expires, at which point *The Star* terminates the subscription.

In 2009, The Star began charging an additional amount, over a subscriber's regular subscription price, for "premium edition" ("Premium Edition") newspapers. Premium Editions (which for purposes of this lawsuit are synonymous with "Special Editions," "Frequency Days," and "Bonus Days") contain a separate section that includes additional content. As a result, Premium Editions are larger and cost more to produce and distribute. Examples of Premium Editions include a Thanksgiving edition, a photo edition, a summer travel guide, and the Major League Baseball All-Star Game edition published when the Kansas City Royals hosted the event in 2012.

Each time *The Star* delivers a Premium Edition newspaper it reduces the subscriber's internal account by the cost for that paper, which shortens the estimated paid-through date and correspondingly moves up the begin date of the next payment period, that is, the renewal date or the date the next payment is due. When *The Star* sends the subscriber a subscription renewal invoice ("Subscription Invoice"),[1] it lists the paid-through date on the invoice as a "due date."

---

[1] In 2009, *The Star* labeled this document a "Subscription Invoice" and then later changed the label to "Subscription Renewal." It is the same document, which throughout this order the Court calls a "Subscription Invoice."

The Subscription Invoice does not state that the due date is an estimated date calculated by the newspaper.

This billing practice of deducting the cost of Premium Editions by shortening the subscriber's due date is what gives rise to Plaintiffs' allegation that Cypress unlawfully shortens its subscribers' subscription period and then "double-billed" subscribers when they renew.

**B.**    ***The Star*'s disclosure of its billing practices on its invoices and renewal notices.**

The Subscription Invoices *The Star* sends to subscribers consists of one sheet of paper with information printed on the front and back. Much of the information on these invoices is printed from a template, and Cypress used slightly different templates to create the Subscription Invoices sent between January 1, 2010, and the present.

On the upper right-hand corner of the front side of the Subscription Invoice is a heading titled "Subscription Invoice" or "Subscription Renewal." The rest of the front page consists of headings for "Account Summary," "Subscription Payment Options," and "Convenient Payment Options" with blank spaces underneath which *The Star* fills in with subscriber-specific information, such as the subscriber's name, address, account number, recent account activity, and individualized proposals to the subscriber for subscription payment options.

In early 2011, *The Star* added a line of small print at the bottom of the "Subscription Payment Options" section disclosing "The expire date will change when charges for any Special Editions apply. See reverse side for details."

The back page of the Subscription Invoice is produced solely from a template so the information is the same for each subscriber who received it on a given date. The back page of each Subscription Invoice from April 2010 to the present explained that on certain dates, all subscribers would receive a newspaper, even if it was not on a day they otherwise would receive

5

one. It also explained that all subscribers would receive the Thanksgiving Day edition, and that they would be charged an additional amount for this newspaper. The exact wording of this notice ("the Thanksgiving Edition Disclosure") changed over time, but the Subscription Invoices disclosed that the amounts charged for the Thanksgiving Day paper would be either $1.25 to $2.00. Later Subscription Invoices described the Thanksgiving Day edition as a Premium Edition.[2]

Beginning in 2009, this information was repeated in the newspaper's Publisher's Notice and in advertisements run in the newspaper in the days and weeks leading up to each Premium Edition's publication.

## C. The O'Shaughnessy's billing history.

*The Star* first delivered a Premium Edition newspaper to Plaintiffs Elizabeth and Michael O'Shaughnessy ("the O'Shaughnessys") on Thanksgiving Day, 2010. Before delivering it, *The Star* sent them Subscription Invoices dated January 19, March 16, May 11, July 6, August 31, and October 26, 2010, offering to renew subscription services and giving them several payment options, including a payment amount of $42.14. Like the Subscription Invoices sent to other subscribers at this time, the back page gave the Thanksgiving Edition Disclosure.

The O'Shaughnessys paid each of the Subscription Invoices in the amount of $42.14, and *The Star* charged the O'Shaughnessys $1.25 for the Thanksgiving Day edition by debiting their account and changing the paid-through date of their subscription.

---

[2] For example, those Subscription Invoices in use from February 9, 2010, to April 4, 2011, explained that "[o]n Thanksgiving Day subscribers will receive this edition at a price of $1.25 over their normal Thursday rate and $2.00 for subscribers who don't typically receive the Thursday paper." From January 20, 2012, to January 20, 2013, the forms stated, "For 2011-12 all subscribers will receive a paper in addition to their paid subscription on the following days . . . Premium Editions, such as the Thanksgiving Day paper, will be charged at a higher rate, not to exceed an additional $2.00, plus applicable tax."

6

In 2011, *The Star* again delivered to the O'Shaughnessys a Thanksgiving Day Premium Edition newspaper. Prior to doing so, it sent the O'Shaughnessys Subscription Invoices dated April 9, June 4, July 30, September 24, and November 19, 2011, offering continuing subscription services for $42.14. Again, these invoices identified certain dates on which all subscribers would receive newspapers as part of their subscriptions and gave the Thanksgiving Edition Disclosure. The back page of these invoices also stated in fine print that: "The expire date will change when charges for any Special Editions apply. See reverse side for details."

The O'Shaughnessys responded to each invoice by paying $42.14, and *The Star* charged the O'Shaughnessys $1.25 for the Thanksgiving edition by debiting their account and changing the paid-through date of their subscription.

Beginning in 2012, and continuing through 2015,[3] *The Star* published five premium edition newspapers a year in addition to the Thanksgiving Day edition. Throughout these years: (1) each invoice *The Star* sent the O'Shaughnessys stated that subscribers would be charged an additional charge of up to $2.00 for Premium Editions, and that charges for Premium Editions would change "the expire date" of their subscriptions; (2) the O'Shaughnessys paid these invoices and continued their subscriptions; and (3) *The Star* delivered the O'Shaughnessys' Premium Edition newspapers and charged them up to $2.00 for each by debiting their account and changing the then-current paid-through date of their subscription.

**D.     Randall Hensley's billing history.**

Plaintiff Randall Hensley ("Hensley") began subscribing to *The Star* in October 2009. He continued receiving the newspaper through April 19, 2010.

---

[3] Since May 21, 2015, the O'Shaughnessys have made monthly payments to *The Star* under an "Easypay" program by which they authorized *The Star* to charge their bank account each month to pay for their subscription services. The "Easypay" program was offered to the O'Shaughnessys on the back of Subscription Invoices they received in 2014 and 2015.

7

At the time he began his subscription, the Publisher's Notice in the newspaper gave the Thanksgiving Disclosure. *The Star* delivered Hensley a Thanksgiving premium edition newspaper on November 26, 2009, and charged him $1.25 for it by changing the paid-through date of his subscription.

Before Hensley made payments in 2010 and 2011 to continue or renew his subscription, *The Star* sent him Subscription Invoices containing the Thanksgiving Edition Disclosure. The Subscription Invoice sent in April 2011 and thereafter also contained some new language in fine print stating that: "The expire date will change when charges for any Special Editions apply. See reverse side for details."

Hensley paid to continue his subscription after receiving these invoices. The Star delivered him the Thanksgiving Day newspaper in 2010 and 2011 and charged him $1.25 and $0.50 respectively by debiting his account and changing the paid-through date of his subscription.

From 2012 through 2015, *The Star* published five premium edition newspapers a year in addition to the Thanksgiving Day edition. Throughout these years: (1) each invoice *The Star* sent Hensley stated that subscribers would be charged an additional amount of up to $2.00 for Premium Editions, and that charges for Premium Editions would change "the expire date" of his subscription; (2) Hensley paid these invoices or, in response to a telephone call, agreed to a new subscription or to renew his subscription; and (3) *The Star* delivered Premium Edition newspapers to him and charged him by debiting his account and changing the paid-through date of his subscription. During this time, Hensley terminated his subscription several times, but after receiving a phone call from *The Star*, he agreed to renew his subscription and *The Star* agreed to reverse all previous Premium Edition charges.

During the periods Hensley subscribed to *The Star*, he was charged a total of $35.60 for Premium Editions, but his account was subsequently credited $37.45 to reverse charges for Premium Editions.

Eventually, Hensley did not renew his subscription, and on June 17, 2015, *The Star* terminated his subscription for non-payment.

## Discussion

Cypress moves for summary judgment on each of Plaintiffs' claims: breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II); violation of the Missouri Merchandising Practices Act ("MMPA") (Count III); money had and received (Count IV); and Plaintiffs' request for punitive damages. The Court holds Cypress is entitled to summary judgment on all claims.

### I. Plaintiffs cannot establish a claim for breach of contract.

Count I asserts a breach of contract claim. It alleges Cypress breached the parties' contract by shortening the Plaintiffs' subscription period to pay for the Premium Edition newspapers, which resulted in double-billing Plaintiffs once they renewed their subscriptions. Pet. (Doc. 1-1) ¶¶ 18-20, 37-38.

The elements of breach of contract are: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff. *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010). Cypress contends Plaintiffs cannot establish a breach of the contract because its practice of changing the existing paid-through date of a subscription to debit the cost of a Premium Edition newspaper was expressly described in and allowed under the parties' contracts.

9

The undisputed facts in the record demonstrate the parties had written agreements—the Subscription Invoices—for newspaper subscriptions, and that Cypress did not breach the agreements. Since early 2011, the front page of every Subscription Invoice stated, "The expire date will change when charges for any Special Editions apply. See reverse side for details." Because it explicitly provided that charges for Special Editions would be debited by changing the subscription's expiration date, Plaintiffs have no viable breach of contract claims since early 2011.

As for the time period prior to 2011, neither set of Plaintiffs can establish a breach of contract claim. Hensley cannot because he was never overcharged for anything. During the entire time Hensley subscribed to *The Star*, he was charged a total of $35.60 for Premium Editions, and his account was subsequently credited $37.45 to reverse these charges. Thus, he has no damages.

The O'Shaughnessys have no claim for this time period either because Cypress breached no contract provision with them. Prior to 2011, they received a single Premium Edition newspaper, the 2010 Thanksgiving Day paper. But each of the six Subscription Invoices they received—and paid—in 2010 prior to the Thanksgiving Day edition's delivery notified them that they would receive this paper and that they would be charged extra for it. Although the Subscription Invoices did not state exactly how they would be charged, they clearly disclosed that the O'Shaughnessys would be charged for this paper. Hence, they cannot claim the charge was not part of their contract.

Accordingly, Cypress is entitled to summary judgment on Count I.

**II.     Plaintiffs cannot establish a claim for breach of the implied covenant of good faith and fair dealing.**

Count II alleges Cypress breached an implied covenant of good faith and fair dealing. "Missouri law implies a covenant of good faith and fair dealing in every contract." *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo. Ct. App. 2000). To establish a claim for breach of this implied duty, Plaintiffs must prove that Cypress used "express contract terms in such a way as to evade the spirit of the transaction or to deny a party an expected benefit." *Id*. The plaintiff "bears the burden of providing *substantial* evidence to show bad faith" on the defendant's part. *Id.* (emphasis added). Plaintiffs argue Cypress acted in bad faith by unilaterally assessing charges for Premium Editions and then deducting these costs by shortening their subscription periods.

The record is devoid of evidence that Cypress used any provision or term of the parties' contracts to avoid the spirit of the contracts, denied Plaintiffs an expected benefit, or otherwise acted in bad faith. The record shows *The Star* provided Plaintiffs with the amount of newspaper content that they bargained for, albeit a small percentage of it in the form of Premium Edition newspapers instead of regular edition newspapers. Granted, *The Star*'s billing practice of changing customers' paid-through date to account for Premium Edition charges could have been more transparent from the beginning, but as a matter of law this is not a breach of the duty of good faith and fair dealing. *See, e.g., Arnold v. AT&T, Inc.*, No. 4:10-cv-2429-SNLJ, 2012 WL 1441417, at *12-13 (E.D. Mo. Apr. 26, 2012) (holding allegation that defendants collected fess for unauthorized prepaid services and made inadequate disclosures of these fees did not state a claim for breach of the implied covenant of good faith and fair dealing under Missouri law).

11

### III. Plaintiffs cannot establish an MMPA violation.

Count III alleges Cypress violated the MMPA. The MMPA prohibits the use of any "unfair practice . . . or the concealment . . . of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. . . whether committed before, during or after the sale, advertisement or solicitation." Mo. Rev. Stat. § 407.020.1. To prevail on an MMPA claim, a plaintiff must demonstrate that he or she: (1) purchased or leased merchandise; (2) primarily for personal, family or household purposes; and (3) thereby suffered an ascertainable loss of money or property, real or personal; (4) as a result of the defendant's use of one of the methods or practices declared unlawful by Section 407.020. *Id.*; *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008).

Plaintiffs allege Cypress violated the MMPA by shortening their subscription periods which was "contrary to the specific terms of the renewal agreements" and "wrongful, unfair, misleading, deceptive, fraudulent, unconscionable, and/or unlawful." Suggestions in Opp'n (Doc. 137) at 93. Plaintiffs contend *The Star*'s billing practice of changing the subscriber's paid-through date "is deceptive, based upon a false pretense, false promise, misrepresentation, and/or unfair practice" because it

> does not tell its subscription customers that it is going to shorten their agreed upon and paid for subscription period when it unilaterally decides to insert a "Premium Edition" (or whatever it is called) into their newspaper, a product of the Kansas City Star which the customer has no choice in and has not agreed to purchase but still has to pay for at whatever price the Kansas City Star decides to charge.

*Id.* at 94-95.

These allegations, however, are inconsistent with the undisputed facts. As discussed above in Section I, either Cypress explicitly disclosed these billing practices or Plaintiffs have no

12

damages. These facts defeat the third and fourth elements of this claim: that Cypress acted deceptively or that Plaintiffs suffered an ascertainable loss as a result of any deception.

Accordingly, Cypress is entitled to summary judgment on Count III.

### IV. Plaintiffs cannot establish a claim for money had and received.

Count IV is an action for money had and received. Plaintiffs contend Cypress received money from them to which it was not entitled by "double-billing" them.

The Court holds Plaintiffs cannot maintain this cause of action on the facts in this case. A claim for money had and received is "founded upon equitable principles whereby the law implies a contract to prevent unjust enrichment." *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo. Ct. App. 2014). But "[i]t is a well-settled principle of law that implied contract claims arise only where there is no express contract." *Id.* Thus, "a plaintiff cannot recover under an equitable theory when she has entered into an express contract for the very subject matter for which she seeks to recover." *Id.*

In the present case, the parties agree that they entered into numerous written contracts via the Subscription Agreements. Although they disagree about what the contract terms were, what these terms meant, or whether Cypress breached the contracts, there is no dispute that an express contract governs the outcome of this case. Accordingly, Plaintiff cannot recover under this theory,[4] and so Cypress is entitled to summary judgment.

Alternately, Cypress is entitled to summary judgment on the merits of this claim. The elements of money had and received are: "(1) the defendant received or obtained possession of the plaintiff's money; (2) the defendant thereby appreciated a benefit; and (3) the defendant's acceptance and retention of the money was unjust." *Id.* at 349 n.1. As discussed above, the

---

[4] While the Court understands why Plaintiffs pled a claim for money had and received—to protect them in the event found the Court found there was no express contract—the record is clear that there was an express contract.

13

Court holds Cypress's billing practice was sufficiently disclosed that retention of the money was not unjust, thus this claim fails.

**V.      Plaintiffs concede that they cannot establish a claim for punitive damages.**

Finally, Cypress argues that Plaintiffs cannot establish a claim for punitive damages. Plaintiffs do not address this argument in their response, so it is conceded. Thus, the Court grants Cypress summary judgment on Plaintiffs' request for punitive damages.

### Conclusion

For the reasons discussed above, the Court holds Cypress is entitled to summary judgment on all claims. Cypress's Motion for Summary Judgment (Doc. 130) is GRANTED.

**IT IS SO ORDERED.**

Date:   September 22, 2016                    /s/ Greg Kays
                                              GREG KAYS, CHIEF JUDGE
                                              UNITED STATES DISTRICT COURT